No. 6021.

JOE RATHER v. THE STATE.

1. MURDER—INDICTMENT—ARREST OF JUDGMENT.—The motion to arrest
the judgment set up, first, that the finding and return of the indictment
by the grand jury into open court was not entered upon the minutes;
second, that the indictment does not warrant a conviction for a higher
grade of crime than murder of the second degree; third, that the min-
utes of the court do not show that a special venire was ever ordered
and drawn in this case. *Held*, that the first and third grounds are not
only contradicted by the record, but they are such as can not be raised
by a motion in arrest of judgment. With respect to the second ground,
the indictment (for which see the statement of the case) is sufficient to
charge murder of the first degree.
2. SAME—INSANITY—CHARGE OF THE COURT—CASES APPROVED.—Note
the opinion for an approval of the rules governing the charge of the
court upon the question of temporary insanity produced by the use of
alcoholic stimulants, as announced in Ward's case, 19 Texas Court of
Appeals, 664, and Leache's case, 22 Texas Court of Appeals, 279.
3. SAME—FACT CASE.—See the statement of the case for evidence *held* suf-
ficient to support a capital conviction for murder.

APPEAL from the District Court of Shelby. Tried below
before the Hon. J. I. Perkins.

The death penalty was assessed against the appellant upon
his conviction for murder of the first degree. The charging
part of the indictment reads as follows:    *    *    *    "that Joe
Rather did in Shelby county, in the State of Texas, on the sixth
day of January, A. D. 1888, of his malice aforethought express
kill and murder Viney Rather, by shooting her with a gun;
against the peace," etc.

James Armour was the first witness for the State. He testi-
fied that he knew the defendant, whom he pointed out in open
court, and, in her life time, he knew the deceased, who was the
wife of the defendant. They lived on the place of the witness,
occupying a cabin in the witness's yard, about fifteen steps dis-
tant from witness's dwelling house. The defendant and the
deceased, in company with a colored girl, left the witness's
house late on the evening of January 6, 1888, to go to a party
at the house of Jane Swindles, which was also on the witness's

place, and near a half mile distant from witness's house. About midnight on that night the defendant came to witness's door, waked witness, and asked him for a lamp and some matches. Witness told him where the lamp and matches were, and he got them. He went to the door, and, after striking two matches, lighted the lamp. While lighting the lamp he spoke to some person outside the door. Witness then got up, went to the door, and saw and spoke to Jim Jennings, who was standing in the yard. Defendant and Jennings then went off toward defendant's house. Witness went back to bed, and about the time he got settled in bed he heard somebody step on the gallery of the defendant's house, and presently he heard the defendant ask the deceased where his gun was. Deceased replied that the gun was on the foot of the bed or under the foot of the bed, witness did not understand which. The witness then went to his door and saw the defendant come out of his house to his gallery, with his gun in his hand. Witness called to defendant to put up his gun. He replied that he would not do it; that "all of them at the party are against me, and Viney——" here he turned and went back into the house. The witness, under the impression that defendant had gone to put his gun away, went back to bed, and but few minutes elapsed until he heard the report of the gun at the defendant's house. He, however, paid no attention to the report, as it was a very common thing for defendant to discharge his gun at night. Within a few minutes the defendant and Jennings came back to witness's house, and defendant asked for the smoke house key, saying that he wanted to get a jug of syrup for Jennings. Witness told him where the key was and he got it. The witness then remembered that he had some meat spread out on the floor of the smoke house, and accordingly got up, dressed and overtook defendant and Jennings at the smoke house door. Witness unlocked the door, but defendant declined to go in, and Jennings and witness went into the smoke house and drew the syrup. The defendant, with his gun in his hand, stood outside of the smoke house door while witness and Jennings drew the syrup. About the time that witness and Jennings left the smoke house, defendant stepped on the gallery of his house and called "Viney" twice. He then said, "O, hell!" and disappeared, and witness did not see him again until the examining trial.

From the smoke house the witness went to his horse lot, and thence returned to his house, and in passing saw Jennings

standing on defendant's gallery. He had put out the lamp, and remarked that he wanted a stopper for his jug. Witness heard a noise issuing from the cabin that sounded like weeping. He called Viney two or three times, and, getting no answer, he told Jennings to go back to the party and tell the girl, who went there in the early part of the night, to come back to deceased, as she, deceased, appeared to be in trouble. Witness then went to bed, and a short while later he heard talking in the yard, and concluded that Jennings had brought the girl back to stay with deceased. He did not understand all that was said by the parties outside, but catching the words, "She only drew two breaths after I got there," he got up, dressed and went to defendant's house, where he found Viney lying across the bed, dead. The entire top of her head had been blown off by a gun shot, the shot entering about an inch above her eyes. Witness heard no other report of a gun on that night than the one above mentioned. A few days before the killing of deceased the defendant killed some hogs for witness. When he started for the slaughter pen he told witness that he had no shot. Witness told him where he could find his (witness's) shot pouch, in which he would find a supply of powder and shot. Defendant got the pouch, and witness had not seen it since. The shot which were taken from the head of the deceased were just like the shot witness had in his pouch. During the time that witness saw the defendant on the night of the tragedy he, defendant, appeared to be excited and angry, but had no appearance of being drunk. He may have taken a drink or two of liquor before the killing, but if so witness could not tell it by his conduct. Witness had known the defendant well for a considerable time, and regarded him as an ordinarily intelligent negro. So far as the witness knew, the defendant and deceased got along very well. They would sometimes quarrel a little, generally about the deceased visiting or wanting to visit her father. Deceased had a three year old and a one year old child, both by defendant. The said children were at the house of the deceased's father at the time of the tragedy.

Randall Cartwright was the next witness for the State. He testified that he was at the party at Jane Swindle's house on the night of the tragedy. Some time before the deceased left the party, the defendant got mad at her about a cake, and made a "lunge" at her, declaring that he would "cut her guts out." This occurred inside of Jane Swindle's house, at which time the witness was on the gallery near the door. Somebody pushed

the defendant from the room to the gallery, whence the witness pulled him to the yard and asked him: "What does all this mean?" Defendant replied: "Nothing, old man; I'll be quiet;" whereupon witness turned him loose. Defendant then ordered the deceased to go home, and witness did not again see her on that night. Defendant remained at the party some little time, during which witness heard him say to Lee Lester: "Lee, you are a single man to-night, and I will be one in the morning." Lee was a married man, but at that time was separated from his wife. Soon after this last occurrence the defendant disappeared. He returned to the party about an hour later, bringing a shot gun with him. He passed witness and called to Luke Rushing. He and Rushing then retired a short distance and talked in a tone of voice too low for witness to distinguish what they said. The defendant then disappeared and witness did not again see him until he was placed in jail. Defendant may have taken a drink or two on that night, but, judging from his actions, witness thought he was sober and was angry with his wife.

Luke Rushing testified, for the State, that he attended the party at Jane Swindle's house on the fatal night, and saw the quarrel between defendant and deceased which occurred at that house. Deceased had a cake at the party which she had baked. The defendant broke it in pieces and was distributing the pieces to persons asking for them, when deceased said to him: "You had better take the bread home to the children." That remark appeared to infuriate the defendant, and he rushed at deceased, and threatened to cut her throat. Witness pushed defendant from the house to the gallery, and Randall Cartwright dragged him from the gallery to the yard. Witness saw no more of deceased on that night. Defendant soon left the party, but returned about an hour later, bringing his gun with him. He stopped at a point near where the witness was standing, and said: "I have shot and killed Viney!" Witness replied, "No, you haven't!" Defendant said: "Yes, by God I have," and went off, and witness saw him no more until after the arrest. So far as the witness could tell, judging from the defendant's talk and actions, defendant was sober.

Alice Cartwright testified, for the State, that she was a cousin of the deceased, and at the time of the killing she had been staying at the house of deceased for several days. She accompanied defendant and deceased to the party at Jane Swindle's

house on that night. They went early and remained, enjoying themselves, until defendant, with a cake in his hand, came to witness and deceased, and told them to get ready to go home. He then turned to Viney's brother, who was standing near, and said to him: "Bud, get your fiddle and let's go home." Bud replied: "I will if you will give me some of that cake." Defendant broke a piece off the cake and handed it to Bud, when several other parties asked for pieces of the cake. While defendant was breaking a piece off the cake for Luke Rushing's wife deceased said to him: "You had better break it all up." Defendant became enraged, drew his knife and put it to his mouth as if to open it with his teeth, when somebody pushed him out of the house and took the knife away from him. When defendant reached the gallery under the pressure of the party pushing him he said to deceased: "I will cut your throat if you don't shut up, you d—d bitch!" Witness's father, Randall Cartwright, then took defendant off and talked with him awhile. Presently the defendant came back and ordered his wife to go home. She left, but defendant remained at the party for some little time. He appeared to be sober, but mad. After awhile he came to witness and said: "Cousin, where is Viney?" Witness replied: "I don't know, but suppose she has gone home. You leave me! You ought to be ashamed to ask for Viney after treating her as you did!" He asked: "How did I treat her?" Witness replied: "You called her a d—d bitch, and threatened to kill her." Defendant said: "Yes, and if I had had old Betsy (a name he applied to his gun) I would have killed her, too!" Witness said to him: "Joe, you know you are not speaking the truth!" He replied: "Well, she had better not be at home when I get there, for if she is I will kill her." Defendant then left, and witness did not see him for some time, when he reappeared at the party with his gun. Andy McClellan rode up to the house, and defendant called him to one side and talked with him for awhile. They talked in a low tone of voice, but witness heard this much: Defendant asked McClellan: "Well, how did you find things?" Andy replied: "I don't know." Defendant then covered McClellan with his gun and said to him: "By God, you do know!" McClellan then said: "Well, Joe, it is just as you said." Defendant soon left Jane's house, and witness had not seen him since until to-day. Defendant was very mad with his wife, but was sober.

The State next proved that defendant was arrested some time

after the murder of deceased, in Tyler county, a hundred and fifty miles distant from the scene of the murder, and rested.

Andy McClellan, the brother-in-law of the defendant, was his first witness. He testified that he saw the defendant and deceased at Jane Swindle's party on the fatal night, and took a drink of diluted alcohol with the former, who had a pint flask of the liquid. He saw defendant take another drink of alcohol between ten and eleven o'clock on that night. Defendant talked loud, and witness thought he felt his drinks. Witness did not see the difficulty between defendant and deceased at the party, nor did he see deceased when she left the party. A little after midnight the witness, going towards defendant's house, met defendant, who had his gun with him. Before recognizing defendant, witness called to him: "Who is that?" Defendant replied: "It is me." Witness asked: "Where are you going?" and he replied: "By God, I have killed Viney!" Witness said: "No, Joe, you haven't." He replied: "Yes, I have; if you don't believe it, go and see." Witness went to defendant's house, and then back to Jane Swindle's party. When defendant saw witness he called him and asked him if Viney was dead. Witness told him that she was, and he left, saying that he was going to his mother's house, in Tyler county, and kill himself. Witness next saw him on this trial.

Tom McCary testified, for the defense, that he saw defendant and deceased at Jane Swindle's party, but did not see the difficulty between them. So far as witness could judge from the defendant's talk and actions, he was sober.

Joe Latham testified, for the defense, that he gave the defendant a drink of alcohol diluted with water, about eight or nine o'clock on the fatal night. Witness took a drink of it at the same time, but was not made drunk thereby. He did not know whether or not defendant felt his drink, but supposed that he did. Defendant did not stagger, but talked loud and seemed excited. He "reared around" considerably after his fuss with his wife.

W. J. Rather testified, for the defense, that he had known the defendant for a number of years. He regarded the defendant as a weak minded man. Witness, however, was not an expert judge of intellectuality. It was possible that witness was weak minded and defendant mentally well balanced, and it was equally possible that defendant's estimate of witness's mental caliber was similar to witness's estimate of his.

William Boles and John Lant testified that they thought the defendant's mind was a weak one, and Margaret McClellan, defendant's sister, testified that he was quite weak minded, and that she was satisfied that defendant was drunk on diluted alcohol both before and after the quarrel with his wife on the fatal night.

Dr. J. W. Rogers testified, for the defendant, as follows: "Alcohol is a stimulant and a narcotic. Its first effects are stimulating and exhilarating, and, when taken in large quantities, its effects are narcotizing. Its tendency is to dethrone reason when taken in sufficient quantities. In lesser quantities it brings out and shows what is in the man when sober. I don't know that its effects would be different upon a strong minded man than upon a weak minded one. Some men can drink more than others. I can feel the effect of a teaspoonful. When a man's reason is dethroned by liquor, it is generally the consequence of protracted spreeing or debauchery, or the taking of large quantities of liquor, either of which will be manifest to the casual observer of the conversation and actions of the person. Drunken men, as a rule, reel and stagger.

N. J. Lester testified, for the State, in rebuttal, that he had known the defendant for several years. He regarded the defendant as a bigoted, but not a weak minded man.

The motion for new trial raised the questions discussed in the opinion.

*Field & Oliver*, for appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This appeal is from a conviction for murder of the first degree, with the penalty assessed at death. The murdered victim was appellant's own wife.

A motion in arrest of judgment was made by defendant's counsel, and was based upon three grounds in substance, as follows: 1. Because the fact of the finding and return of the indictment by the grand jury into open court was not entered upon the minutes of the court. 2. Because the indictment does not warrant a conviction for a higher grade of crime than murder of the second degree. 3. It does not appear from the minutes of the court that a special venire was ever ordered and drawn to try this defendant in this case.

None of these grounds are sustained when the record as it is here presented is consulted. But even if the record failed to contradict (as it does affirmatively), the first ground of the motion, such objection could not be availed of on a motion in arrest, but, if available, must be made so by exception taken *in limine* to the indictment. (Rowlett v. The State, 23 Texas Ct. App., 131, and authorities cited.)

As to the second ground, the indictment is a good and sufficient one for murder of the first degree. (Willson's Crim. Forms, No. 388, p. 173; Bean v. The State, 17 Texas Ct. App., 60; Sharpe v. The State, Id., 486; Lucas v. The State, 17 Texas Ct. App., 79; Walker v. The State, Id., 176; Penland v. The State, Id., 365.)

The third ground of the motion is one which, if sustained by the record, could not be taken advantage of by a motion in arrest of judgment after a trial.

We have carefully examined the charge of the court in connection with the objections to it as shown in the record and so forcibly presented in the able oral argument and brief of counsel for appellant, and we are constrained to say that we have found no tenable objection to it. It is, in our opinion, a most clear, fair and able exposition of the law applicable to the case as made by the evidence, and in that portion of it relative to temporary insanity produced by the use of alcoholic stimulants, it was in strict harmony with our statute and rules of decision upon the subject. (Acts of 1881, p. 9; Ward v. The State, 19 Texas Ct. App., 664; Leache v. The State, 22 Texas Ct. App., 279.)

With regard to the evidence, suffice it to say that in our opinion, it amply supports the verdict and judgment. A more unprovoked, cruel, heartless and brutal murder can scarcely be conceived than that disclosed by the record here presented. There is not one single palliating circumstance to relieve its enormity.

We are of opinion appellant has had a fair and impartial trial, and one free from reversible error. We are also of opinion that the punishment is one he has merited by the crime he is proven to have committed.

The judgment is affirmed.

*Affirmed.*